## The Alumnae Association of the William Penn High School for Girls v. The Trustees of the University of Pennsylvania.

*William C. Ferguson, Jr.*, for petitioner.
*Henry S. Drinker, Jr.*, for respondent.

McDevitt, P. J., August 27, 1931.—This case came on for argument on petition for declaratory judgment.

The question involved is: When an unincorporated association, which later becomes incorporated, contracts with a hospital for a subscription by the former of a certain amount of money, and the hospital agrees to furnish certain services to the members of the association in consideration of such subscription, and no mention is made of the duration of the arrangement, which is simply referred to as an "endowment," is not the contract perpetual while the hospital and its successors carry on business, or may the hospital return the subscription and discontinue the services whenever it sees fit?

The petitioner in this case is a corporation of the first class of the State of Pennsylvania by decree of Court of Common Pleas No. 1 of Philadelphia County, December Term, 1910, No. 1611. Its active members are graduates of the Commercial Department of the High School for Girls, the Commercial High School for Girls and the William Penn High School for Girls. These three institutions, operating successively and not simultaneously, have provided a commercial course for women in the public school system of this city. At present there are 641 active and associate members of petitioner.

The association commenced its activities in February, 1906. On June 8, 1909, Miss McDermott, the then secretary, wrote to the Medico-Chirurgical Hospital, requesting advice from the trustees of that hospital as to whether or not an "endowment" would be accepted. A copy of her letter is not extant, but its contents are disclosed in the answer of the superintendent of the hospital (petitioner's exhibit "A").

The answer of the hospital was that the institution would "accept the endowment of a private bed in a private room by the association, and would grant the privilege of allowing any one member of the association who might at any time require hospital treatment the use of this bed with medical attendance and nursing." Mr. Signor, the superintendent, concluded this letter with an expression of opinion that the board of trustees would contribute $500 towards an endowment of $5000, and would install an appropriate brass tablet on the door of the room. In this letter, also, it was set forth that upon payment of the first $1000 the members of the association might have the privileges of the hospital.

On December 5, 1911, Miss Kroneberger, the then treasurer of the association, then incorporated, addressed a letter to the hospital, enclosing a check for $1000 on account of the endowment (petitioner's exhibit "B"), making $2600 which had been paid to date. In this letter the treasurer set forth the association's understanding of the terms of the endowment, and concluded:

"We would ask you, when acknowledging receipt of the enclosed check, to send us a resolution of your Board accepting the check and approving of the terms of the Endowment as stated herein."

One of the terms of the endowment is that when the room is not occupied by members of the association, the hospital shall have the right to its use for any other patient.

On April 22, 1912, David Milne, the hospital's then treasurer, answered Miss Kroneberger's letter (petitioner's exhibit "C"). Mr. Milne reported to Miss Kroneberger that the conditions of her letter were assented to and that he proposed to have her letter spread upon the minutes of the hospital in order that it might become a matter of record.

When the last $1000 was paid by the association on January 28, 1913, the association exacted a receipt from the treasurer of the hospital, Mr. Milne (petitioner's exhibit "D"), which sets forth that the money was received "on account of a fund of Five Thousand ($5000) Dollars for the endowment of a free room, together with $500 contributed by the Board of Trustees to this fund, is in full settlement of the endowment; the terms and conditions of which are fully set forth in a letter of the Association to the Medico-Chirurgical Hospital, dated the Fifth day of December, 1911, and the minutes of the Board of Trustees of the said Hospital relating thereto, together with their letter in reply to the letter of the Association dated the fifth day of December, 1911."

On February 17, 1913, a record of the transaction appears in the minutes of the hospital. This minute is set forth in full in paragraph seven of the petition. It states that petitioner has completed "its fund for the endowment of a free bed," records the contribution by the trustees of $500, and says that the last sum contributed by petitioner "is in full payment of the endowment, the terms and conditions of which are fully set forth in a letter of the association to the Medico-Chirurgical Hospital under date of December 5, 1911."

On July 31, 1916, there was a merger of the Medico-Chirurgical College of Philadelphia and the Medico-Chirurgical Hospital of the City of Philadelphia with the Trustees of the University of Pennsylvania. This was accomplished by virtue of proceedings in the Court of Common Pleas No. 5 of this county, as of June Term, 1916, No. 2147 (petitioner's exhibit "E"). A significant term of the agreement, which appears on page seven of the printed record, is that "the assets, property and *endowments* held by the Trustees of the Medico-Chirurgical College and Hospital Corporations, shall pass in absolute ownership to the corporation of the University of Pennsylvania, to be held as a separate fund and used exclusively for the erection, equipment, development and maintenance of the Medico-Chirurgical College and Hospital—Graduate School of Medicine in the University of Pennsylvania."

It is also agreed that teaching shall end at Medico-Chi "upon the transfer of the assets, property and endowments as aforesaid."

In another agreement between the merging parties there is a provision by which the property of the Medico-Chirurgical Hospital is to be maintained as a separate fund and used exclusively for the operation of the Graduate School of Medicine of the University of Pennsylvania.

In two letters from Mr. Milne, as treasurer of the Medico-Chirurgical College and Hospital, dated November 29, 1916, and June 12, 1918, he states that the agreement with the University of Pennsylvania "provides for a presentation of the endowments of the Medico-Chirurgical Hospital and the carrying out of all agreements made by the hospital." And "it has been arranged that the Alumnæ Association of the Wm. Penn High School for Girls shall have a bed at the Hospital on Lombard Street between 17th and 18th Street."

In the beginning of 1931, Doctor Smelzer, the director of the Graduate Hospital, the successor of Medico-Chi, wrote to petitioner setting forth the hospital's present attitude on the subject of petitioner's endowment, which is also stated in Mr. Drinker's letter to petitioner's counsel, offering to return the endowment of $4500 to petitioner.

The contentions of the hospital and the respondent corporation, of which it is a part, are that the services now being rendered under the "endowment" cost over $2000 a year, with the possibility of further increase.

The persons who contributed $4500 to the Medico-Chirurgical Hospital had in mind some definite service which they were to receive in return.

Except as to duration, the terms of the contract were put in writing in anticipation of mergers, consolidations and changes in personnel of the hospital board. The court interprets the writings and actions of both parties to the endowment as having contemplated the continuation of hospital service during the entire existence of the respondent and its successors.

It is fair to assume that the young women who comprised the petitioner's organization in 1909, desiring to provide for their future needs, would not have made the gift had they assumed that at the will of the respondent the bargain could be rescinded.

It is a specious argument to say that the Medico-Chirurgical Hospital building has been torn down and the room originally endowed is no longer in existence, or that a charity is not required to operate its business forever. The law assumes that the contract will last as long as the subject matter, to wit, hospital services. Naturally these would have to end if respondent no longer conducted a hospital. But in the merger the University of Pennsylvania definitely agreed to continue the Medico-Chirurgical endowments.

For twenty-two years no one has questioned the perpetual character of the contract.

A charity can make a binding contract for coal, supplies or services, and a hospital can contract to provide one person with hospitalization for one day, at a given rate. It can similarly contract with a number of parties for the period of existence of itself and its successors.

Respondent argues that it cannot perform its services under the present cost.

It is no defense that a contract has become onerous to one of the parties.

Respondent solicits funds, both from the public and the Commonwealth, on the ground that it is a charity. Charities generally, and hospitals notably, do business at a loss. A hospital obtains the full cost from its patrons when it can. If it received the full cost from every patron, it would cease to be a charity and could no longer solicit the support of the public. Respondent may carry on this free bed at a loss, as it carries on some of its other departments at even greater loss.

Those who contributed the $4500 were working girls who had just graduated from a business high school. Presumably they did not then, as much as in later years, need the service of the hospital. The hospital had the benefit of the endowment when little use was made of the hospital, and when hospital

charges were lower. Now, when petitioners are in greater need of the hospital services, respondent seeks to evade its contractual obligation because the present cost of the services exceeds any possible return on the money. Such evasion will not be permitted, nor will the proffered return of the endowment money, after having been retained for twenty years, relieve respondent of its obligations.

Courts have a right to assume that both parties to every contract will deal equitably. Both parties to an ordinary contract agree to do certain things, and while restrictions are not always written into such legal documents, it must be inferred from the positive covenants that the negative of the same is prohibited, and, in addition to the expressed covenants and obligations, good faith and fair dealing are always implied and binding upon both parties.

If the respondent seeks equity, then the several endowments it enjoys should be grouped and a determination reached as to whether the income from all endowments equals or surpasses the cost of rendering the various services required by the different endowments. In other words, if it is to be considered a purely commercial transaction, then such rules as govern commercial enterprises should be applied. No business venture makes a profit on all sales or transactions, but the aggregate sales show a profit. To single out one room or one endowment is equivalent to a department store viewing one department and then determining that the entire store is a loss, even though the profits from all departments more than balance the loss from one.

The court finds that when an unincorporated association, which later becomes incorporated, contracts with a hospital for a subscription by the former of a certain amount of money, and the hospital agrees to furnish certain services to the members of the association in consideration of such subscription, no mention being made of the duration of the arrangement, which is simply referred to as an "endowment," the contract is perpetual while the hospital and its successors carry on business. The court further finds that the hospital may not return the subscription and discontinue the services when it sees fit.